2004-NMCA-129

102 P.3d 102

TAOS MUNICIPAL SCHOOLS CHAR-
TER SCHOOL, Plaintiff–Appel-
lee/Cross–Appellant,

v.

Michael J. DAVIS, New Mexico State Su-
perintendent of Public Instruction, in
his official capacity, Defendant–Appel-
lant/Cross–Appellee.

No. 23,940.

Court of Appeals of New Mexico.

Sept. 3, 2004.

Certiorari Denied, No. 28,904, Oct. 25, 2004.

Ronald J. VanAmberg, Roth, VanAmberg,
Rogers, Ortiz, Fairbanks & Yepa, L.L.P.,
Santa Fe, NM, Robert J. Malone, Taos, NM,
for Appellee/Cross–Appellant.

Patricia A. Madrid, Attorney General,
David A. Stevens, Assistant Attorney Gener-
al, Santa Fe, NM, for Appellant/Cross–Ap-
pellee.

*OPINION*

PICKARD, Judge.

{1} Taos Municipal Schools Charter School
(TCS), which consists of two facilities located
ten miles apart, each housing different
grades of students, sought classification as
two "public schools" so that it could secure
additional funds that the State Department
of Public Education (the State) offers to
small schools. The State decided not to clas-
sify TCS as two "public schools," and TCS
filed suit. The district court granted a de-
claratory judgment stating that TCS is two
"public schools," each of which is entitled to

the additional funds. The court also issued an injunction ordering the State to pay TCS the funds to which it would be entitled when its program costs were recalculated. The State appealed this decision. TCS cross-appealed the district court's decision not to issue a writ of mandamus and its decision not to award pre-judgment interest. Holding that TCS is not two "public schools" for funding purposes, we reverse the district court's decision. Accordingly, we need not decide the issues that TCS raises on cross-appeal.

## FACTS AND PROCEEDINGS

{2} TCS is a charter school that is part of the Taos Municipal School District (the District). In its agreement with the District (the charter), TCS set out its plan for administration and curriculum. The charter consistently refers to TCS as a school, as opposed to multiple schools. TCS has one chief administrator, one governing council, and one curriculum.

{3} As TCS moved toward opening, it encountered difficulty in finding one facility that would provide adequate space for grades kindergarten through eight. TCS decided to operate in two facilities at two different sites about ten miles apart. The Randall Lane site houses grades kindergarten through four. The Arroyo Seco site houses grades five through eight.

{4} When TCS initially contacted the State to determine the budget, a state employee suggested that the two facilities would be eligible for additional funds because each would be treated as a separate school, with each meeting the criteria for the size adjustment factor in funding calculations. Later, the State informed TCS that the two facilities would not be considered two separate schools and that TCS would not meet the criteria for the adjustment. This resulted in an estimated 25% decrease in TCS's entire budget. Although TCS initially pursued an estoppel claim based on these two different representations, it does not seek review of the estoppel claim on appeal.

{5} TCS filed suit in the district court seeking a declaratory judgment that TCS was eligible for the size adjustment, a writ of mandamus to force the State to make the

adjustment, an injunction to compel the State to pay the school the additional funds from the size adjustment, and pre-judgment interest on those funds. After the parties filed cross-motions for summary judgment and the State filed a motion to dismiss, the district court held a hearing. The district court decided that TCS was two public schools for purposes of funding calculations, and it issued a declaratory judgment and injunction against the State. It did not award pre-judgment interest.

## DISCUSSION

### 1. Jurisdiction

{6} The State argues for the first time on appeal that the district court had no jurisdiction to hear TCS's claim for declaratory relief because there was no waiver of sovereign immunity. We review jurisdictional issues de novo. *Weddington v. Weddington*, 2004-NMCA-034, ¶ 13, 135 N.M. 198, 86 P.3d 623. In this case, however, neither party has thoroughly briefed this issue. Because a decision on this jurisdictional issue is not necessary in light of our ruling on the merits in favor of the State, we will address the merits of the district court's declaration and leave the complex and interesting issue of jurisdiction to another day.

### 2. Is TCS Two "Public Schools" for Funding Purposes?

{7} This case requires us to interpret the statutes governing public school funding and charter schools. We review issues of statutory interpretation de novo. *Bd. of Comm'rs of Doña Ana County v. Las Cruces Sun-News*, 2003-NMCA-102, ¶ 19, 134 N.M. 283, 76 P.3d 36. Our goal is to ascertain legislative intent, which is primarily indicated by the plain language of the statute. *Id.* When the statute's language is clear and unambiguous, we give the statute its plain meaning. *Id.*

#### a. Charter Schools

{8} The Public School Code, codified at Chapter 22 of our statutes, includes the 1999 Charter Schools Act. NMSA 1978, §§ 22-8B-1 to -15 (1999, as amended through 2003). Charter schools fulfill a variety of goals, in-

cluding the facilitation of innovative teaching styles, the creation of new opportunities for teachers, and the increased interaction of schools and the communities they serve. Section 22–8B–3. Charter schools are responsible for their own operation and are largely held to the same standards as other public schools. Section 22–8B–4.

{9} Individuals or groups who wish to start a new charter school put together a detailed application including the school's mission, governing structure, educational plan, and budget. Section 22–8B–8. The local school board has the authority to approve applications for charter schools in its area. Section 22–8B–6(A). After a local school board approves a charter school, the approved application becomes a contract, known as a charter, that contains all the agreements that the board and the charter school have made. Section 22–8B–9.

### b. Public School Funding Formula

{10} The Public School Code addresses funding using two broad categories: operational funding and capital funding. The Public School Finance Act, NMSA 1978, §§ 22–8–1 to –45 (1967, as amended through 2004), governs the operational funding of New Mexico's public schools. Charter schools receive the funds for their operational costs through the same allocation process as other public schools. *See* § 22–8B–13.

{11} Generally, public schools must fund capital expenditures from other sources. Section 22–8–41(A) (prohibiting school districts from spending operational funds on building acquisition or construction unless they meet certain criteria). Public schools often finance capital expenditures through bonding. *See* NMSA 1978, §§ 22–19–2 and –3 (1967). Additional capital funding is governed by the Public School Capital Outlay Act, NMSA 1978, §§ 22–24–1 to –9 (1975, as amended through 2004); *see also* NMSA 1978, §§ 22–25–1 to –10 (1975, as amended through 2004) (Public School Capital Improvements Act). Schools may also get short term capital financing through the School District Bond Anticipation Notes Act. NMSA 1978, § 22–19B–2 (2002). A charter school must either raise its own money for start-up capital costs or negotiate for funds or facilities with the local school board. Section 22–8B–4(D), (G). The legislature has also created a Charter Schools Stimulus Fund that provides money for start-up costs and building renovation costs. Section 22–8B–14. After a charter school is established, the Public School Capital Outlay Act requires local school boards to take their charter schools' continuing capital needs into consideration. Section 22–24–5(B)(9)(f).

{12} A key feature of New Mexico's public school operational funding scheme is the state equalization guarantee distribution, which is a formula through which the State apportions federal and local revenue for schools equitably among the state's school districts. Section 22–8–25; *see also Bd. of Educ. for Carlsbad Mun. Sch. v. State Dep't of Pub. Educ.*, 1999–NMCA–156, ¶ 2, 128 N.M. 398, 993 P.2d 112. The Secretary of Public Education, who was known as the State Superintendent of Public Instruction when this litigation commenced, works with local school boards to calculate how many "program units" each school district has using a formula detailed further below. Section 22–8–25(D); *see also* § 22–8–12.1 (explaining the information that local school boards provide in the process). The legislature assigns a dollar value per program unit. *See* § 22–8–2(I). The State gives each school district its share of funds based primarily on how many program units it has. Section 22–8–25(D).

{13} The State calculates program units using a formula set out in the statutes. The calculation begins with basic program units, which are tabulated by multiplying student enrollment in each of four age brackets by the cost differential factor for that bracket. Section 22–8–20. To this base figure, the State adds a number of special factors, such as special education program units or bilingual multicultural program units. Section 22–8–21 (special education program units); Section 22–8–22 (bilingual multicultural education program units). The factor at issue in this case is the size adjustment program unit. Section 22–8–23.

{14} In smaller schools, fixed operational costs like curriculum development and ad-

ministration must be distributed among fewer students. *See* Lewis D. Solomon, *Edison Schools and the Privatization of K–12 Public Education: A Legal and Policy Analysis,* 30 Fordham Urb. L.J. 1281, 1299 (2003) (describing economies of scale in school operation). Because the cost differential factor used to calculate basic program units is based on estimated operational costs per student, the size adjustment factor addresses the issue that it is essentially more expensive to educate a child in a small school than in a larger one. It does so by giving additional program units to "approved public school[s]" with small student bodies. Section 22–8–23. For elementary and junior high schools, a school must have fewer than 200 total enrolled, qualified students to be eligible. *Id.;* § 22–8–2 (definitions).

### c. Classification of TCS

{15} Because TCS offers only elementary and junior high grades and its total enrollment at both locations is greater than 200 students, it is only eligible for size adjustment program units if it is classified as two approved public schools. *See* § 22–8–23. The Public School Finance Act does not define "approved public school" or "public school." *See* § 22–8–2. When some words in a statute are not defined, we give them their ordinary meaning unless a different legislative intent is ascertainable. *Smith v. Bd. of County Comm'rs,* 2004–NMCA–001, ¶ 11, 134 N.M. 737, 82 P.3d 547. "[W]here several sections of a statute are involved, they must be read together so that all parts are given effect." *Id.* (internal quotation marks and citation omitted).

{16} "[P]ublic school" is defined in the "General Provisions" section of the Public School Code as

> that part of a school district that is a single attendance center in which instruction is offered by one or more teachers and is discernible as a building or group of buildings generally recognized as either an elementary, middle, junior high or high school or any combination of those and includes a charter school[.]

NMSA 1978, § 22–1–2(L) (2003). TCS argues that its Arroyo Seco and Randall Lane locations are each a "single attendance center," and thus each is a public school. We disagree that this is the end of the inquiry. The Code does not define the term "single attendance center," and we find this term to be ambiguous and without a commonly understood meaning. TCS's multiple assertions that it is two "single attendance center[s]" begs the question. Furthermore, we must also take into consideration the plain language in TCS's own charter, which repeatedly refers to it as a "school" rather than two schools.

{17} When the meaning of a statute is ambiguous, we "consider the policy implications of the various constructions of the statute." *State v. Rivera,* 2004–NMSC–001, ¶ 14, 134 N.M. 768, 82 P.3d 939. In doing so, we examine the history, background, and overall context of the statute. *Id.* ¶ 13. Our main goal is always to ascertain legislative intent. *Id.* ¶ 12.

{18} As explained above, the legislature's intent in providing a size adjustment is to account for the increased per-student operational costs in smaller schools primarily associated with administration and curriculum. In the present case, TCS points to no operational costs that are higher as a result of its decision to locate in two facilities. Because both locations of TCS share one administration and one curriculum, it appears that TCS is not incurring the very costs that provide the rationale for the size adjustment program units.

{19} Instead, TCS indicates that its capital costs are higher, including rent and facility maintenance. As a result, TCS argues, it has been forced to use operational funds for capital expenditures, resulting in operational cutbacks. TCS appears to argue that, because the Public School Finance Act predated the existence of charter schools, the legislature did not think about how charter schools would cover capital costs. However, it appears that the legislature did specifically contemplate this issue in developing its funding policies. Thus, the legislature provided charter schools with the options of financing their initial capital costs through negotiation with the local school board, application for funds from the Charter Schools Stimulus

Fund, or through private fund raising. *See* §§ 22–8B–4 and –14. TCS availed of itself of $123,000 in start-up funding that was available for capital expenses. We do not agree that there is a legislative void in the area of charter school capital start-up funding that can justify the use of operational funds for other purposes.

{20} We also believe that the legislature did not intend for a charter school to be able to become more than one "public school" without State approval. We find two major sources of support for this notion. First, the State is responsible for ensuring that no more than 15 charter schools start up each year statewide. Section 22–8B–11(B). If a school like TCS can become two public schools without State approval, we are uncertain as to the effect that would have on the growth of charter schools that the legislature apparently intended to control quite carefully. Furthermore, public schools must obtain permission from the State before establishing, closing, or otherwise reconfiguring a school, and there is a requirement that notice of such changes be given in a timely fashion when they are expected to affect the equalization guarantee. 6.30.2.10(F) NMAC (2003). This regulation makes no exception for charter schools, and it lends credence to the State's argument that TCS needed to go through some process to obtain approval from the State, in addition to obtaining approval from the local school board, before it could become two schools.

{21} Second, the statutes provide for charter school districts, which consist of multiple charter schools. NMSA 1978, §§ 22–8C–1 to –7 (1999) (Charter School District Act). It appears that the district court analogized TCS to a school district in making its decision. However, TCS is not a charter school district; nor has it taken any steps to become one.

{22} TCS argues at length that its non-traditional grade configuration, with grades kindergarten through four at the Randall Lane site and grades five through eight at the Arroyo Seco site, should not determine whether it is one school or two. We agree that grade configuration is not the sole factor in the analysis, especially because charter schools are meant to be innovative and non-traditional. However, our reasons for determining that the State properly classified TCS as one "public school," set forth above, do not rely on the grade grouping.

{23} TCS also appears to argue that Section 22–8B–13, stating that a charter school will receive "not less than ninety-eight percent of the school-generated program cost," entitles TCS to 98% of all of its costs. However, this argument avoids the central question. "[P]rogram cost[s]" are defined as the number of program units to which a school district is entitled multiplied by the per unit dollar amount that the legislature assigns. Section 22–8–2(I). A school is only entitled to size adjustment program units if it meets the statutory criteria, and TCS is only entitled to size adjustment program units if it is defined as two schools. A charter school has no right to additional funding if capital expenditures or any other expenditure becomes so great that its actual costs far exceed its "program costs."

{24} Start-up funding, and particularly start-up capital funding, has been an obstacle that charter schools have faced across the country. Judith Johnson & Alex Medler, *The Conceptual and Practical Development of Charter Schools,* 11 Stan. L. & Pol'y Rev. 291, 294 (2000). As it stands, our legislature has chosen to make the costs and negotiations associated with new charter school facilities part of the charter schools' rights and responsibilities. Section 22–8B–4. If this proves to be a difficulty for charter schools, it is for the legislature to address, as it did with the Charter Schools Stimulus Fund. In doing so, the legislature must balance charter schools' needs against the ever-growing demands of all public schools, which in turn compete for scarce governmental resources against a myriad of other programs. The answer is not to reinterpret the Public School Finance Act in a way that undermines the very decisions and priorities that the legislature clearly established.

{25} In light of our holding that the district court erred in granting declaratory judgment for TCS, we do not need to address the issues related to the injunction. We also do not need to address any of the issues on

cross-appeal, including the writ of mandamus and pre-judgment interest.

## CONCLUSION

{26} We reverse the district court's order granting declaratory and injunctive relief to TCS.

{27} **IT IS SO ORDERED.**

WE CONCUR: CYNTHIA A. FRY, and CELIA FOY CASTILLO, Judges.